# TEUNIS VAN WILGEN v. ALBERT LEA FARMS COMPANY.[1]

February 1, 1929.

No. 26,960.

[1]Reported in 223 N. W. 301.

See note in 59 L. R. A. 817; 28 L.R.A.(N.S.) 156; 27 R. C. L. 1106; 3 R. C. L. Supp. 1546.

*Meighen, Knudson & Sturtz,* for appellant.
*Wright, Nelson & Plunkett* and *F. G. Sasse,* for respondent.

TAYLOR, C.

The term defendant will designate the Albert Lea Farms Company, the action having been dismissed as to the other defendant.

A portion of plaintiff's land was overflowed in the year 1926, and he recovered a verdict for the damage to his crops. Defendant appealed from an order denying the usual alternative motion for judgment or a new trial. Defendant does not question the fact of the flooding nor the damage to the crops, but insists that the flooding was not caused by any wrongful or negligent act on its part but by an unprecedented rainfall.

To understand the situation a short statement of facts seems necessary. Defendant owned some 14,000 acres of a peat marsh in Freeborn county which it was developing for agricultural uses. The eastern part of this tract was in the western part of the town of Moscow. Hans Jacobson owns, and for many years operated, a farm described as the east half of the southwest quarter and the northwest quarter of the southwest quarter of section four in that town. The 40 lying along the section line includes a portion of the marsh and is bounded on the west and south by defendant's land. The remainder of the farm and a considerable area east of it drains into the marsh through ravines on this 40. The marsh slopes slight-

ly toward the west and south, but there is no defined natural channel or waterway leading from this farm. Some shallow ditches leading from the farm had been constructed prior to 1900, but they apparently did not afford any efficient drainage and had filled up to such an extent that they were little more than slight depressions in the surface. In 1906 and 1907, judicial ditch No. 1 was constructed, but afforded little drainage to section four, as water from that section could not reach it without flowing for some two miles through the marsh. In 1921 judicial ditch No. 4, enlarging and extending judicial ditch No. 1, was established. Branch 93 of this ditch is one-fourth of a mile west of section four.

The board of county commissioners laid out several county roads over the marsh, including one on the west line of section four, and authorized defendant to construct them. To drain the roadways, defendant dug a ditch along them with a buckeye ditching machine depositing in the roadbed the material so excavated. These ditches, termed "buckeye ditches" in the record, were six or seven feet in depth and about ten feet in width at the top. In course of time the material deposited in the roadway was spread and leveled, a layer of clay was hauled upon it, and a surface of gravel placed thereon, forming a roadway 20 feet or more in width. When a road was completed, the "buckeye ditch" was refilled by grading off the edges so as to form a shallow ditch at the side of the road 14 to 16 feet in width and two feet or more in depth at the center. In 1922 defendant dug a "buckeye ditch" along the road laid out on the west line of section four. This ditch was on the east side of the road but within the right of way. It ran south to the southwest corner of the section and then west along the south line of section five to branch 93 of judicial ditch No. 4. This "buckeye ditch" drained the marsh on the Jacobson farm so that a portion of it was broken and cultivated. Plaintiff, a truck farmer, rented the Jacobson farm for a term beginning with the season of 1926. He planted something over four acres of the marsh in celery, onions and potatoes. During the summer of 1926 defendant constructed the road along the west line of section four, and then filled in the "buckeye

ditch" in the usual manner. Before filling in the ditch, defendant placed eight-inch tile in the bottom across its own land and 14-inch tile across the road at the southwest corner of the section and larger tile from there to branch 93 of judicial ditch No. 4. The tile east of the road was covered to a depth of about two feet with the porous peat soil of the marsh through which water penetrated readily. The road embankment prevented surface water from the east from flowing west except as it was carried across the road by the 14-inch tile, as no culverts had been constructed across the road.

In September, 1926, there was a rainfall of about 7 inches in 24 hours, of which more than 6 inches fell in the space of 11 hours. This was a greater rainfall than had ever previously been recorded in that vicinity. The 14-inch tile was unable to carry off the water which came down from the high lands at the east, and the road embankment held it back upon plaintiff's land causing the damage for which he seeks to recover. Plaintiff charges that defendant was negligent in failing to construct a culvert across the road or provide any escape for surface water except through the 14-inch tile laid two feet below the surface of the "buckeye ditch" as refilled.

Defendant claims that plaintiff's damage was caused by a rainfall so extraordinary and unprecedented as to be termed "an act of God," and that defendant was not required to anticipate or provide for it. Defendant further claims that as plaintiff's land had not been assessed for the construction of judicial ditch No. 4, it was not entitled to the benefit of a drain using that ditch as an outlet. Defendant further claims that the court erred in charging the jury that plaintiff was entitled as a matter of law to the drainage benefits resulting to his land from the "buckeye ditch" as originally constructed along the section line. Defendant further claims that the court erred in refusing to instruct that defendant was not liable if the damage was caused by a rainfall so unprecedented that the history of rainfall in that locality afforded no reasonable warning that such a rainfall might occur.

L. 1925, p. 637, c. 415, § 61, provides that no drain for the drainage of lands not assessed for the construction of an existing ditch

system shall be constructed so as to use such system as an outlet without first securing express authority therefor as therein prescribed. The Jacobson land had not been assessed for judicial ditch No. 4, and no authority to drain that land into that ditch had been obtained. Defendant contends that by reason of this statute plaintiff had no right to the benefit of the drainage afforded by drains which discharged into judicial ditch No. 4. This particular contention is of little moment in this case, for that statute could apply only to drains thereafter constructed.

Defendant further contends that the "buckeye ditches" were dug merely to facilitate the work of constructing the roads and were never intended to be left as originally constructed or to form a part of the drainage system of the marsh; and that such ditches along the side of the roadway would be so dangerous to travelers that as a safety measure it was necessary to refill them to a substantial extent and leave no more than a broad, shallow depression without abrupt banks. Defendant doubtless had the right to dig these ditches in connection with its road-building and to refill them in the manner in which they were refilled, and the court went too far in instructing the jury to the effect that plaintiff "was entitled, as a matter of law, to the drainage benefits resulting to his land" from the "buckeye ditch" as originally constructed.

However the matter of digging and refilling this ditch is not in itself of much importance in this case. Defendant constructed an embankment across the end of the marsh, which operated as a dam and prevented water coming through the ravines from the high lands at the east from following its natural course; and the real question is whether defendant ought to have provided a more efficient outlet for such water than the 14-inch tile laid two feet below the surface.

It does not appear that the county provided any plans or specifications for the highways or gave any directions concerning them. Defendant seems to have proceeded according to its own ideas and to have determined for itself how it would construct them and the condition in which it would leave them. Defendant could not

needlessly dam up the natural outlet of surface waters and cast them back upon plaintiff's land. Jungblum v. M. N. U. & S. W. R. Co. 70 Minn. 153, 72 N. W. 971; Town of King v. Brekke, 151 Minn. 474, 187 N. W. 515; Eiken v. M. & M. R. Co. 151 Minn. 99, 186 N. W. 226.

That the construction of a culvert would have been both easy and feasible is not questioned. It was the duty of defendant to provide a culvert or other outlet sufficient for the passage of the surface water resulting from such rains as defendant in the exercise of ordinary foresight ought to have anticipated as likely to occur. Heavy rains had occurred previously although none so heavy as this. If defendant failed to provide a sufficient outlet to take care of the water from such rainfalls as it ought reasonably to have anticipated and provided for and plaintiff's crops were damaged by reason thereof, defendant is liable therefor and plaintiff entitled to recover. On the other hand, if defendant provided a reasonably sufficient outlet for the water from such rainfalls as in the exercise of ordinary prudence and foresight it ought to have anticipated as likely to occur, and the damage resulted from a downpour so unprecedented that defendant could not reasonably be expected to have anticipated and provided for it, defendant is not liable therefor. In other words, if defendant provided a proper outlet for the water from such rainfalls as it reasonably ought to have anticipated, it is not liable; but if it failed to provide a proper outlet for the water from such rainfalls as it ought to have expected, it is liable and is not relieved from liability by the fact that the rainfall in question happened to be of an unprecedented character, for in that case its negligence added to the overflow. 27 R. C. L. 1106; Ann. Cas. 1918A, anno. 1114. While the cases cited involved natural watercourses, we see no reason why the same principle should not be applied where the natural outlet for surface water is needlessly obstructed.

If the rainfall was of such a character that the damage to plaintiff's crops would have been equally as great if defendant had made no change in conditions, the acts of defendant could not be said to

be the proximate cause of the damage and it could not be held liable therefor. The court properly charged the jury to that effect.

Defendant requested an instruction that if the jury found from the evidence that the injuries to plaintiff's crops were caused by the rainfall "being so extraordinary and unprecedented that the history of rainfall in that locality afforded no reasonable warning of its coming—no reasonable expectation that such a rainfall would ever happen," their verdict should be for defendant. The court refused to give the instruction requested, and gave no instruction as to the rules applicable in the case of an unprecedented rainfall.

Whether the damage resulted from the negligent failure of defendant to provide a suitable outlet for such flood waters as it ought to have anticipated and provided for, or solely from an unprecedented downpour which could not reasonably have been expected or foreseen, were the vital questions in the case and were questions for the jury under the evidence. We think the case called for an instruction to the effect that defendant was not liable for damage from an unprecedented rainfall if it had made reasonable provision for the escape of water from such floods as were known to occur in that vicinity. Without such an instruction, the charge as given was likely to lead the jury to believe that if the embankment held the water back upon plaintiff's land that fact established liability for the damage, regardless of the character of the outlet which defendant had provided. Their attention should have been called to the fact that defendant was not liable unless it had failed to make suitable provision for such floods as past history showed were likely to occur.

Order reversed and a new trial granted.